UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/4/11
```

RICHARD L. BRODSKY, et al.,

        Plaintiffs,

    v.

UNITED STATES NUCLEAR REGULATORY
COMMISSION,

        Defendant.

09 Civ. 10594 (LAP)

OPINION AND ORDER

LORETTA A. PRESKA, Chief United States District Judge:

Richard L. Brodsky, Westchester's Citizens' Awareness Network, Public Health and Sustainable Energy, and the Sierra Club-Atlantic Chapter (collectively "Plaintiffs") allege that the United States Nuclear Regulatory Commission ("NRC" or "Commission") acted unlawfully in granting an exemption to Entergy Nuclear Operations, Inc. ("Entergy"), the owner, operator, and licensee of Indian Point Energy Center[1] ("IPEC" or "IP3").

The NRC moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), or, in the alternative, for summary judgment pursuant to Rule 56. At oral argument, all parties agreed that the case was appropriate for resolution on summary judgment. An administrative record has

---

[1] The facility, located in Westchester County, is known also as the Indian Point 3 nuclear power plant. On June 25, 2010, Entergy was granted status as an Intervenor Defendant.

been submitted to the Court, and it is appropriate that the
Court consider that record in reviewing the Commission's
actions.  Therefore, the Court treats the Commission's motion as
one for summary judgment.

For the following reasons, the Commission's motion for summary
judgment is granted.

## I.    BACKGROUND

In 1954, Congress passed the Atomic Energy Act, as amended,
42 U.S.C. § 2011 et seq., (the "AEA" or "Act").  The Act created
the Atomic Energy Commission, later renamed the Nuclear
Regulatory Commission, to regulate and develop nuclear energy,
including all nuclear plant licensing.  The AEA is "virtually
unique in the degree to which broad responsibility is reposed in
the administrative agency, free of close prescription in its
charter as to how it shall proceed in achieving the statutory
objectives."  Siegel v. Atomic Energy Comm'n, 400 F.2d 778, 783
(D.C. Cir. 1968).

In accordance with the AEA, the Commission is charged with
determining whether a plant's operation is "in accord with the
common defense and security and will provide adequate protection
to the health and safety of the public."  42 U.S.C. § 2232(a).
Additionally, under the AEA, the NRC has the power to amend,
revise, or modify all licenses, by reason of rules and
regulations issued by the Commission.  See id. § 2237.

2

### A. The Commission's Fire Protection Program

In 1980, the NRC adopted fire safety rules in response to a nearly catastrophic fire at the Browns Ferry power plant.  The fire prompted the NRC to adopt a comprehensive program to prevent, detect, control, and extinguish fires in operating nuclear power plants.  In promulgating these rules, the Commission's goal was to design safe, alternative shutdown measures.  A nuclear power plant must have duplicate systems for shutting down reactor units in the case of an emergency.  The regulations, in part, set in place fire barriers to protect redundant systems that power the plant's shutdown systems.  See Fire Protection Program for Operating Nuclear Power Plants, 45 Fed. Reg. 76,602 (Nov. 19, 1980).  These rules (codified at 10 C.F.R. § 50.48 and 10 C.F.R. Pt. 50 App. R) are at issue here.[2]

The Commission's rules provide three fire-safety options that a licensee could adopt to protect duplicate shutdown capacity. Id.  These three methods are: (1) separation of cables and equipment of a redundant system by a barrier capable of withstanding fire for three hours; (2) separation of the

---

[2]  Section 50.48(b) sets forth the Commission's fire protection rule.  Appendix R to this part "establishes fire protection features . . . with respect to certain generic issues for nuclear plants licensed to operate before January 1, 1979." 10 C.F.R. § 50.48(b).  Therefore, the specific features from which exemptions were granted are located in Appendix R.

3

redundant system by a distance of more than twenty feet with no intervening combustible material or fire hazards, together with fire detectors and an automatic fire suppression system; and (3) enclosure of cable and equipment and associated non-safety circuits of one redundant system in a barrier able to withstand fire for at least one hour, along with fire detectors and an automatic fire suppression system. 10 C.F.R. Pt. 50, App. R, III.G.2 (1980). The final rules stipulated that "alternative shutdown capacity" must be protected by one of these three methods. Id. In this case, Plaintiffs challenge the NRC's decision to grant Entergy an exemption from the third method that requires electrical cables to withstand fire for at least one hour. (Compl. ¶ 15.)

In Connecticut Light and Power Co. v. Nuclear Regulatory Commission, 673 F.2d 525 (D.C. Cir. 1982), a licensee challenged the newly-adopted fire protection rules as unreasonable. The court upheld the fire protection program in its entirety and affirmed the Commission's authority to promulgate fire safety rules. Id. When the NRC passed the fire protection program in 1980, it allowed for a thirty-day window for licensees to apply for exemptions from the requirements. See id. at 530. The NRC granted exemptions upon a showing that the required plant modification "would not enhance fire protection safety in the facility or that such modifications may be detrimental to

4

overall facility safety." 10 C.F.R. 50.48(c)(6); see Conn.
Light, 673 F.2d at 530. The Connecticut Light court found the
exemption procedure to be "critical" to the new rules. 673 F.2d
at 530. Because of different structural designs, not every
nuclear power plant could comply with the new fire protection
regulations. The court found the exemption process to be
integral to the reasonableness of the new rules. The
Connecticut Light court held that "[t]he practical effect of the
exemption procedure is thus to give utilities a fourth
alternative: if the company can prove that another method works
as well as one of the three stipulated by the NRC, in light of
the identified fire hazards at its plant, it may continue to
employ that method." Id. at 534.

  According to the court, the exemption procedure indicated that
the NRC did not intend "to limit protective measures to the
three methods stipulated in the rule, 10 C.F.R. 50, App. R,
III.G.2 (1980)." Id. at 536. Plaintiffs argue that the
exemptions in Connecticut Light concerned only those filed
within thirty days of the new rules taking effect. Here,
neither the Commission nor Entergy discovered that certain
electrical cables were non-conforming to the rules established
in 1980 until twenty-five years later in 2005. Therefore, the
NRC argues that the Connecticut Light rationale for granting
exemptions exists under the present circumstances.

### B. The Indian Point 3 Nuclear Power Plant

Over approximately the last thirty years, Entergy applied for and received specific exemptions from the fire protection requirements at IP3.[3]  The instant application to the Commission requested a revision to the earlier granted exemptions.  First, in 1984, the NRC granted IP3 exemptions from the Appendix R features in designated areas, including Fire Area ETN-4 (Fire Zones 7A, 60A and 73A).  (JA 44-55.)[4]  At that time, IP3 was employing a fire barrier called Hemyc, which was believed to satisfy the one-hour fire requirement under Appendix R.  Based on NRC's investigation, the agency granted IP3 an exemption. (Id.)  The exemption order discussed, among other things, the fire detection and suppression systems, the distance between shutdown systems, and the durability of the glass and asbestos

_____

[3]  In 1982, Entergy submitted an evaluation of IP3 to the Commission reviewing its compliance with Appendix R. Simultaneously, Entergy requested twenty-six exemptions from the Appendix R requirements.  The Commission staff recommended that eight exemptions be granted, sixteen exemptions be denied, and found two exemptions to be unnecessary.  (JA 136.) From 1984 through 1987, Entergy supplemented the evaluation of IP3 and requested an additional seven exemptions.  (Id.)  Therefore, the Commission has a long history of reviewing the Appendix R regulations at IP3 and in most cases has denied requests for exemptions.

[4]  "JA" refers to the "Joint Appendix," attached to the Declaration of Benjamin H. Torrance.  Also attached to the Torrance Declaration is the Certified Index of the Record.  The Joint Appendix and Certified Index constitute the record submit to the Court for its review.

braided cables in the areas based on a series of fire tests. (JA 50-51.) In the end, the Commission concluded that "the existing fire protection for the configuration inside the cable tunnels and electrical penetration area provides an acceptable level of fire protection equivalent to that provided by Section III.G.2." (JA 51.) Second, in 1987, the NRC revisited the earlier-granted exemption for Fire Area ETN-4 and concluded that the exemption should still be considered valid. (JA 143-45.) Further, the Commission considered an additional exemption request for Fire Area PAB (Primary Auxiliary Building)-2 (Fire Zone 1). (JA 127, 138.) After analyzing the alternative fire protection measures, the NRC concluded that "if a fire occurs in this location, safe shutdown could still be achieved and maintained." (JA 143.)

In 2005, the NRC discovered that Hemyc was actually non-conforming to its rules. Despite its one-hour fire barrier rating, it could only withstand a fire for 27 to 49 minutes. The NRC informed all licensees in the country of the deficiency with Hemyc cables. (NRC Information Notice 2005-07, JA 167.) The NRC directed licensees to confirm compliance with the existing regulations in light of this new information. (NRC Generic Letter 2006-03, JA 209.)

In June 2006, Entergy notified the NRC to potentially non-conforming Hemyc barriers at IP3. (JA 229.) Based on NRC

tests, Entergy revealed that the Hemyc installations at IP3 were declared "inoperable." (JA 230.) On July 24, 2006, Entergy requested the NRC provide it with revised exemptions from the Appendix R requirements for Fire Areas ETN-4 and PAB-2 which were granted in 1984 and 1987, respectively. (JA 234.) Entergy's position was that a "Hemyc ERFBS [electric raceway fire barrier system] fire resistance rating of 30 minutes will provide sufficient protection for the affected raceways, with adequate margin, to continue to meet the intent of the original request for exemption and conclusions presented in the January 7, 1987 SER [safety evaluation report].") (JA 235.) Entergy attached to its request a safety report to support its revision request. (JA 234-51.) In that evaluation, Entergy discussed, inter alia, the Hemyc fire barriers, structural features in the two fire zones, ignition sources, transient combustible and hot work controls, and fire detection and suppression systems. (Id.)

In response, on February 2, 2007, the chief of the Commission's Fire Protection Branch requested, by letter, additional information on the requested revision of existing exemptions. (JA 275.) The NRC forwarded to Entergy detailed questions asking about case-specific concerns, including the type and amount of transient combustibles in the areas, proximity to other fixed combustibles, postulated fire

scenarios, and the location of drains and dikes in the area.
(JA 277.)   On April 30, 2007, Entergy submitted its responses to
the Commission's request for additional information.   (JA 444-
60.) On August 16, 2007, Entergy amended its exemption request
to ask that Fire Area ETN-4 be rated for only 24 minutes. (JA
461.)

On September 24, 2007, pursuant to the National Environmental
Policy Act ("NEPA"), the NRC issued an Environmental Assessment
("EA") and a finding of no significant impact ("FONSI") holding
that Entergy's revised exemption would not significantly impact
the environment.   (JA 488.)   According to Plaintiff, this is
when the public first became aware of Entergy's exemption
request.   (Compl. ¶ 29.)   Four days later, on September 28,
2007, the NRC granted Entergy's application for an exemption.
(JA 496.)

On October 4, 2007, the NRC issued an order granting Entergy
an exemption from NRC fire protection rule, 10 C.F.R. pt. 50,
App. R, III.G.2.A.C. The NRC published the approval in the
Federal Register.   See Revision to Existing Exemptions, 72 Fed.
Reg. 56,798 (Oct. 4, 2007).

On December 3, 2007, Plaintiffs filed a formal objection with
the NRC contesting the exemption granted to Entergy. (JA 513.)
Petitioners requested that the NRC hold a public hearing on the

issue. (Id.) On January 30, 2008, the NRC rejected Plaintiffs'
petition. (JA 909.)

### C. The Court of Appeals' Decision

On March 27, 2008, Plaintiffs filed a petition with the Court
of Appeals appealing from the NRC's rejection of their objection
to the exemption granted Entergy. Brodsky v. U.S. Nuclear
Regulatory Comm'n, 578 F.3d 175 (2d Cir. 2009). The Hobbs Act
gives the courts of appeal "exclusive jurisdiction to enjoin,
set aside, suspend (in whole or in part), or to determine the
validity . . . of all finals orders of the [NRC] made reviewable
by section 2239 of title 42." 28 U.S.C. § 2342(4). In relevant
part, § 2239(a) includes "any proceeding . . . for the granting
suspending, revoking, or amending of any license."

On May 5, 2008, the NRC moved to dismiss the petition, arguing
that the exemption was properly granted and that exemptions do
not require hearings under the Commission's regulations.
Brodsky, 578 at 179. On August 27, 2009, the Court of Appeals
dismissed Plaintiffs' petition on jurisdictional grounds. Id.
at 183-84.

The Court of Appeals held that "[t]he plain text of § 2239(a)
does not confer appellate jurisdiction over final orders issued
in proceedings involving exemptions, irrespective of any hearing
requirement." Brodsky, 578 F.3d at 180. Accordingly, the
jurisdiction determination depended on whether exemptions were

10

included within § 2239(a).  The Court of Appeals held they were
not.  Id.  The Commission argued that an exemption is distinct
from "the granting, suspending, revoking, or amending" of a
license.  (Id.)  The Court of Appeals agreed and held that "this
is a reasonable interpretation of the Hobbs Act, and one that
deserves deference."  Id. at 180-81.  The court held that it
"cannot read exemptions into the plain text of § 2239(a),
particularly when the NRC itself (to which deference is owed) is
urging that exemptions are different from" amendments.  Id. at
181.  Moreover, the court held that the NRC's exemption program
has existed in some form since 1956 and that Congress has
amended §2239(a) since then and never included exemptions in the
statute's text.  Id.

     Therefore, the Court of Appeals held that it lacked
jurisdiction under the Hobbs Act to review exemptions.  Id. at
182.  However, because it would only lack jurisdiction if the
order challenged was indeed an exemption, the Court went on to
decide whether the October 4th NRC Order was an exemption or
amendment.  Id.

                    1. The Commission's Order Is an Exemption, Not
                       an Amendment

   The Court of Appeals held that while the label placed upon an
order by an agency is not conclusive, the labels deserve
deference when they are reasonable.  Id. at 182.  The NRC

applied 10 C.F.R. § 50.12 in deciding whether to grant an exemption.  The Brodsky court held that "[a]n agency's application of its own regulations is 'controlling unless plainly erroneous or inconsistent with the regulation[s].'" Brodsky, 578 F.3d at 182 (citing Auer v. Robbins, 519 U.S. 452, 461 (1997)); see also Fed. Express Corp. v. Holowecki, 522 U.S. 389 (2008) ("[T]he agency is entitled to . . . deference when it adopts a reasonable interpretation of regulations it has put in force.")  "Ultimately the agency's judgment, if reasonable, must prevail."  Brodsky, 578 F.3d at 182.  The Court of Appeals concluded that the Commission applied its regulations and rules reasonably in this case when it classified Entergy's application as an exemption.[5]  (Id.)  The Court found that "[c]onsistent with 10 C.F.R. § 50.12, the agency concluded that treating the challenged order as an exemption was authorized by law, presented not undue risk to public health and safety; and was consistent with the common defense and security."  Id. Additionally, the NRC found that "special circumstances" justified this exemption as the "underlying purpose" of Appendix R would still be satisfied after the exemption.  Id. (citing 10 C.F.R. § 50.12(a)(2)(ii)).

---

[5]  The Court of Appeals noted that it lacked jurisdiction to consider the validity of the regulations themselves.  Id. at 182 n.4.  In part, Plaintiffs are asking this Court to rule the Commission's rules and regulations unlawful.

In concluding, the Court of Appeals held that because it lacked jurisdiction it expressed no opinion as to, inter alia, whether the NRC's denial of a hearing was proper or whether the exemption at issue is arbitrary and capricious. Id. at 183-84. The Court held only that Petitioners were challenging an exemption, not an amendment, and exemptions are not directly reviewable by the Court of Appeals. Id. at 184. In a final footnote, the Court of Appeals remarked that "Petitioners are free to seek review in the district court of the NRC's actions pursuant to the APA." Id. at 184 n.6.

## II.   DISCUSSION

Pursuant to Rule 56, summary judgment is appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party, but that party cannot prevail by showing the "mere existence of some alleged factual dispute between the parties." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment has the initial burden of establishing that no genuine issue of material fact exists. Celotex, 477 U.S. at 323. If the moving party satisfies this burden, the burden

13

shifts to the non-movant to come forth with evidence demonstrating a genuine issue of material fact. Id.

Plaintiffs allege twenty-one causes of action pursuant to the AEA, the Administrative Protection Act ("APA"), and NEPA. Plaintiffs' claims can be grouped into five categories:

(1)   The NRC lacks authority to create or issue exemptions to the fire protection program. (Counts 1-4)

(2)   The AEA and APA required the NRC to hold public hearings on exemptions. (Counts 5-9)

(3)   The NRC was required by NEPA to prepare an Environmental Impact Statement ("EIS").  (Counts 10-11.)

(4)   The NRC failed to consider probative evidence or relied on evidence not in the administrative record.  (Counts 12-19, 21)

(5)   The NRC awarded the exemption too quickly and could not have had adequate time to evaluate the request. (Count 20).

The Commission's position is that as a matter of law each of Plaintiff's claims fails.  The Court addresses each of these charges in turn.

### A. The NRC's Exemption Authority

The AEA established a comprehensive regulatory framework governing the operation of nuclear power plants in the United States.  See Vermont Yankee Nuclear Power Corp. v. Natural Res.

14

Defense Council, Inc., 435 U.S. 519, 525-526 (1978) ("Under the
Atomic Energy Act of 1954, 68 Stat. 919, as amended, 42 U.S.C. §
2011 et seq., the [Nuclear Regulatory Commission] was given
broad regulatory authority over the development of nuclear
energy."); Riverkeeper, Inc. v. Collins, 359 F.3d 156, 167 (2d
Cir. 2004); Cnty. of Rockland v. U.S. Nuclear Reg. Comm'n., 709
F.2d 766, 769 (2d Cir. 1983).  The Commission was granted
express statutory authority to "make, promulgate, issue,
rescind, and amend such rules and regulations as may be
necessary to carry out the purposes of this chapter."  42 U.S.C.
§ 2201(p) (1976).

      The NRC is charged with the "primary responsibility" to
ensure that the "generation and transmission of nuclear power
does not unreasonably threaten the public welfare." Cnty. of
Rockland, 709 F.2d at 769; see also Riverkeeper, 359 F.3d at
167.  In accordance with this mandate, the NRC has the authority
to promulgate and establish rules governing the operation of
nuclear power plants. 42 U.S.C. § 2201(p); see Cnty. of
Rockland, 709 F.2d at 769. Where Congress has granted
comprehensive regulatory powers to an agency, the Supreme Court
has found that the power to grant exemptions is an inherent part
of that authority.  See, e.g., U. S. v. Allegheny-Ludlum Steel
Corp., 406 U.S. 742, 755 (1972) ("It is well established that an
agency's authority to proceed in a complex area such as car-

                              15

service regulation by means of rules of general application
entails a concomitant authority to provide exemption procedures
in order to allow for special circumstances.")   Undoubtedly,
nuclear safety is a complex area of regulation, and the
Commission has been delegated with broad authority to ensure the
safety of nuclear power plants.

Plaintiffs contend that the AEA does not expressly
authorize exemptions.   (Compl. ¶¶ 52, 56, 62, 69.)   Thus,
Plaintiffs challenge the validity of 10 C.F.R. § 50.12, which
authorizes exemptions.   Plaintiffs concede, however, that the
NRC has authority to grant, modify and amend licenses to nuclear
power facilities and to make rules and regulations to govern
their operation.   (Compl. ¶ 52.)   The Commission argues that as
part of that mandate, it has authority to grant exemptions to
the rules it promulgates.   (Defs.' Mem. 10.)   Under Plaintiffs'
reasoning, the Commission's regulations are "ironclad" and can
only be altered through the formal amendment procedure.   (See
Pls.' Mem. Opp. 1.)

Generally, the Commission has broad authority in making
decisions regarding nuclear plant safety.   Cnty. of Rockland,
709 F.2d at 770 ("The Commission's authority is broad—it may
shut down a nuclear plant or take additional enforcement action
if not satisfied with emergency preparedness.");   Duke Power
Co., 770 F.2d at 390 ("Because of the unique nature of [nuclear

16

safety], it has been well said that 'broad responsibility is reposed in the administrative agency [i.e., the Commission], free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives.'" (citing N. Anna Envtl. Coal. v. Nuclear Regulatory Comm'n, 533 F.2d 655, 659 (D.C.Cir. 1976))).  In County of Rockland, the court remarked:

> One of the most emotional issues confronting our society today is the adequacy of safety measures at nuclear power facilities. . . .  [T]he debate over nuclear safety persists as public interest groups charge that serious problems remain and operator-utilities seek to assure the public that all reasonable measures have been taken to protect surrounding populations in the event of a major nuclear accident.  But it is the United States Nuclear Regulatory Commission . . . which must decide the difficult questions concerning nuclear power safety.

> 709 F.2d at 766.

Plaintiffs' arguments are unpersuasive.  Pursuant to 10 C.F.R. § 50.12, the NRC may grant exemptions where "the exemptions are authorized by law, will not present an undue risk to public health or safety, and are consistent with the common defense and security" and where "special circumstances" are present.

17

The regulations set forth six special circumstances.[6]  The
Commission need only find that one special circumstance applies
in order to grant an exemption.[7]  The authority to grant
exemptions has been a part of the agency's regulatory structure
for over fifty years.  See Brodsky, 578 F.3d at 181 ("[T]he

---

[6] Any one of the following "special circumstances" can justify an
exemption:

(i) Application of the regulation in the particular
circumstances conflicts with other rules or requirements of
the Commission; or
(ii) Application of the regulation in the particular
circumstances would not serve the underlying purpose of the
rule or is not necessary to achieve the underlying purpose
of the rule; or
(iii) Compliance would result in undue hardship or other
costs that are significantly in excess of those
contemplated when the regulation was adopted, or that are
significantly in excess of those incurred by others
similarly situated; or
(iv) The exemption would result in benefit to the public
health and safety that compensates for any decrease in
safety that may result from the grant of the exemption; or
(v) The exemption would provide only temporary relief from
the applicable regulation and the licensee or applicant has
made good faith efforts to comply with the regulation; or
(vi) There is present any other material circumstance not
considered when the regulation was adopted for which it
would be in the public interest to grant an exemption. If
such condition is relied on exclusively for satisfying
paragraph (a)(2) of this section, the exemption may not be
granted until the Executive Director for Operations has
consulted with the Commission.

10 CFR § 50.12.

[7] According to Plaintiffs, if an exemption is permitted, it must
be temporary in order to be valid.  However, that is only one of
the six special circumstances listed in 10 C.F.R. § 50.12.
Clearly, the plain language of the rule does not require that
all exemptions be temporary.

18

NRC's exemption program has been on the books in some form since 1956") (citing 21 Fed. Reg. 355 (Jan. 19, 1956)). The Court of Appeals decided it did not have original jurisdiction over the Commission's action in this case because it was an exemption, not an amendment. Moreover, a number of courts have affirmed the Commission's authority to grant exemptions. See, e.g., Brodsky, 578 F.3d 175; Int'l Bhd. of Elec. Workers, Local 1245 v. Nuclear Regulatory Comm'n, 966 F.2d 521 (9th Cir. 1992); Shoreham-Wading River Cent. Sch. Dist. v. Nuclear Regulatory Comm'n, 931 F.2d 102 (D.C. Cir. 1991); Massachusetts v. Nuclear Regulatory Comm'n, 878 F.2d 1516 (1st Cir. 1989); Eddleman v. Nuclear Regulatory Comm'n, 825 F.2d 46 (4th Cir. 1987); Duke Power Co v. Nuclear Regulatory Comm'n, 770 F.2d 386 (4th Cir. 1985).

Plaintiffs rely principally on Alabama Power Co. v. Costle, 636 F.2d 323 (D.C. Cir. 1979) to argue that the NRC does not have authority to grant an exemption. That case is inapposite here. In Alabama Power, the Environmental Protection Agency promulgated a categorical, blanket exemption "from the clear commands of a regulatory statute." 636 F.2d at 358. Here, the NRC has not created any blanket or categorical exemption from any explicit rule set forth in the AEA. In fact, this case concerns a case-specific exemption from Commission-promulgated regulations. The Alabama Power court took care to distinguish

19

its facts from the type of case before this Court.  The Court

held:

> [W]e are not concerned here with the "equitable"
> discretion of agencies to afford case-by-case
> treatment taking into account circumstances peculiar
> to individual parties in the application of a general
> rule to particular cases, or even in appropriate cases
> to grant dispensation from the rule's operation.  The
> need for such flexibility in appropriate cases is
> generally recognized, and enhances the effective
> operation of the administrative process, though
> Congress may, of course, restrain the agency by
> mandating standards from which no variance is
> permitted.

Id. at 357-58.  Clearly, the Alabama Power holding was not

intended to hamstring an agency's ability to make case-specific

decisions where necessary for special circumstances.

Moreover, the Alabama Power court reviewed an exemption

contrary to the express language in a congressional statute.

The court described the agency's action as seeking "vindication

of an approach contrary to the explicit statutory design on the

basis of its estimate of its lack of capacity to handle the task

delegated to it."  Id. at 359-60.  This is not the issue before

this Court.  Here, the Commission promulgated the rules in

Appendix R, pursuant to a mandate from Congress to establish

fire-safety rules.  The NRC did not grant an exemption to

Entergy contrary to an express statutory requirement.  There is

nothing in the record to suggest that the Commission's creation

of fire safety rules was anything but in conformity with its

legislative mandate.  Rather, the Court of Appeals in
Connecticut Light affirmed the Appendix R fire safety program as
adopted by the Commission.  673 F.2d at 528.  Further, the
Connecticut Light court upheld the Appendix R rules because the
final rules allowed for exemptions, which the court concluded
were a "critical element of flexibility."  Id. at 530.

The argument that the NRC is authorized to promulgate rules
but does not have the ability to modify those rules on a case by
case determination defies common sense.  The NRC's authority to
establish rules and regulations must go hand in hand with the
agency's ability to grant exemptions on a case by case basis to
those very same rules.

### B. Section 2239(a) Does Not Require Public Hearings for Exemptions

Only the items listed in § 2239(a)(1)(A) give rise to the
right to a public hearing.[8]  Plaintiffs assert three reasons for

---

[8]  Section 189(a) of the AEA, codified at 42 U.S.C. §
2239(a)(1)(A), provides:

> In any proceeding under this chapter, for the
> granting, suspending, revoking, or amending of any
> license or construction permit, or application to
> transfer control, and in any proceeding for the
> issuance or modification of rules and regulations
> dealing with the activities of licensees, and in any
> proceeding for the payment of compensation, an award
> or royalties under sections 2183, 2187, 2236(c) or
> 2238 of this title, the Commission shall grant a
> (continued on next page)

why a public hearing was necessary.   (Pls.' Mem. Opp. 11-12.)
None of their reasons falls within the scope of
§ 2239(a)(1)(A).

First, Plaintiffs assert "that the IP3 'exemption,' because
of its scope, permanency, and safety and public health
consequences was in fact and effect an amendment to Entergy's
license."  (Pls. Mem. 11.)  As discussed above, the Court of
Appeals decided this issue.  Section 2239(a) does not mention
exemptions, and the Court of Appeals, in this case, deferred to
the judgment of the Commission that categorized this action as
an exemption, not an amendment.  Brodsky, 578 F.3d at 182-83.

The Court of Appeals held that "the plain text of § 2239(a)
does not confer appellate jurisdiction over final orders issued
in proceedings involving exemptions, irrespective of any hearing
requirement."  Id. at 180 (emphasis added).  Plaintiffs focus on
this language to argue that the Court of Appeals' decision not
to extend jurisdiction is irrelevant to whether a hearing is
required pursuant to § 2239(a).  Plaintiffs are correct that
"the jurisdictional element and hearing requirement of § 2239(a)
are not coextensive," id., however, only to demonstrate that the
Court of Appeals has jurisdiction over "all final orders in

_____

(Continued from previous page)
hearing upon the request of any person whose interest
may be affected by the proceeding, and shall admit any
such person as a party to such proceeding.

22

licensing proceedings whether or not a hearing before the
Commission occurred or could have occurred." Id. (quoting
Florida Power & Light Co. v. Lorion, 470 U.S. 729, 737 (1985)).
The Supreme Court in Lorion held that "Congress intended to
provide for initial court of appeals review of all final orders
in licensing proceedings whether or not a hearing before the
Commission occurred or could have occurred."  470 U.S. at 737.
Therefore, a hearing would not be a condition precedent to the
Court of Appeals' jurisdiction under the Hobbs Act.  Id.
However, in order to determine jurisdiction the Court of Appeals
had to determine whether the subject matter of the appeal was
related to licensing.

        In the end, the Court of Appeals adopted the NRC's
distinction of exemptions from amendments in concluding that it
did not have jurisdiction, pursuant to § 2239(a).  Brodsky, 578
F.3d at 180 ("The NRC takes this stance to avoid having to hold
hearings for exemptions; but by asserting that exemptions are
different from amendments, a position to which we defer, the NRC
necessarily deprives us of the ability to review exemptions
pursuant to § 2239(a).").  Here, the Court defers as well to the
NRC's reasonable distinction between exemptions and amendments
and to its conclusion that in this case the NRC order
constituted an exemption.  Thus, because § 2239(a) does not
refer to exemptions no hearing was required.

Second, Plaintiffs assert that "the AEA requires a public hearing if the NRC takes an action that results in a 'modification of a rule or regulation.'" Plaintiffs argue that by granting the exemption changing the fire insulation requirement at IP3, the NRC modified the rules or regulations. This argument misses the mark also. The Commission could have modified the fire safety regulations themselves but did not do so. Instead, it granted an exemption, based on a case-by-case review, to one particular facility, pursuant to 10 C.F.R. § 50.12. Therefore, the exemption does not trigger §2239(a)'s mandatory hearing requirements.

Third, Plaintiffs argue that the NRC has a regulatory requirement that "the public be given notice of a proposed 'significant modification' to a license and a thirty-day period to comment on the significant modification." (Pls. Mem. Opp. 11-12.); see 10 C.F.R. § 50.91(a); 10 C.F.R. § 2.104. Plaintiffs assert that the "IPEC 'exemption' significantly modifies the actions, responsibilities and obligations of the licensee, and as such is subject to the hearing requirements of 10 C.F.R. 50.91(a)." (Pls. Mem. Opp. 13.) Like § 2239(a), this section only applies to an application for a license amendment and thus is not applicable here for the same reasons. The very language of this section states that it only applies to a "significant modification" to a license.

24

It is well settled that the "grant of an exemption from a generic requirement does not constitute an amendment to the reactor's license that would trigger hearing rights." Kelley v. Selin, 42 F.3d 1501, 1517 (6th Cir. 1995); see Massachusetts v. U.S. Nuclear Regulatory Comm'n, 878 F.2d 1516, 1522 (1st Cir. 1989) ("A hearing is mandatory only when the proceeding concerns the 'granting, suspending, revoking, or amending' of the license."); Eddleman v. Nuclear Regulatory Comm'n, 825 F.2d 46, 49 (4th Cir. 1987) (affirming NRC's order granting exemption without holding a hearing because the exemption was unrelated to licensing); Union of Concerned Scientists v. U.S. Nuclear Regulatory Comm'n, 735 F.2d 1437, 1443 (D.C. Cir. 1984) (sustaining the "NRC's reading of section 189(a) to grant a hearing only as to the issues material to the Commission's licensing decision."). Plaintiffs rely on Bellotti v. U.S. Nuclear Regulatory Comm'n, 725 F.2d 1380 (D.C. Cir. 1983) to support their position that a hearing is mandatory. However, that case is inapposite. In Bellotti, there was no doubt that the order constituted a license amendment. There was no disagreement that § 2239(a) applied. The only issue was whether the state's attorney general could intervene and participate in the hearing.

The exemptions here are unrelated to licensing. Therefore, this Court follows the guidance of the several circuit courts

25

that have deferred to the Commission's discretion to not grant hearings for exemptions.

### C. The APA Does Not Require a Public Hearing

Plaintiffs argue that, pursuant to the APA, 5 U.S.C. § 554, a hearing is required because the "exemption" process used by the NRC was (1) "not in accordance with law," (2) "in excess of statutory jurisdiction," insofar as the modification of Appendix R via an "exemption" was ultra vires, and (3) "without observance of procedure required by law" as set forth in Section 189(a) of the AEA (42 U.S.C. 2239). (Pls. Mem. Opp. 15.)

Plaintiffs cite no case law for these propositions. Plaintiffs' argument under the APA is the same as under the AEA; specifically, the Commission does not have authority to grant exemptions. Section 554 of the APA applies only to "adjudication[s] required by statute to be determined on the record after opportunity for an agency hearing," 5 U.S.C. § 554(a), and the Court of Appeals has held that § 2239 does not require such a hearing. See 41 North 73 West, Inc. v. U.S. D.O.T., No. 09-4810-ag, 2010 WL 4318655, at *5 (2d Cir. Nov. 2, 2010) (holding that the APA does not require a hearing where the court held that no hearing was required pursuant to the underlying statute). Because the NRC's actions were not unlawful and did not fall under § 2239(a), the APA does not mandate a hearing.

Additionally, Plaintiffs argue that Entergy's request for an exemption did not conform with the options provided by the NRC in its Generic Letter 2006-03 responding to non-conforming conditions with respect to Hymc.  However, in the Generic Letter under the section entitled "Requested Actions" the NRC states that corrective actions must be implemented in accordance with existing regulations.  (JA 215.)  Defendants argue, correctly, that those regulations include 10 C.F.R. § 50.12, which authorizes exemptions.  Plaintiffs' claim that the APA mandated a hearing, independent of the AEA requirements, is without merit.

D. An Environmental Impact Statement Was Not Required

On September 24, 2007, pursuant to NEPA, the NRC issued an EA and FONSI holding that Entergy's requested exemption would not significantly affect the environment.  Plaintiffs argue that the Commission was required to issue an EIS, which is more comprehensive than an EA.  The Commission's decision that an EIS was not necessary was not arbitrary, capricious or an abuse of discretion.

The Supreme Court has described the purpose of NEPA as "where an agency action significantly affects the quality of the human environment, the agency must evaluate the 'environmental impact' and any unavoidable adverse environmental effects of its proposal." Metropolitan Edison Co. v. People Against Nuclear

27

Energy, 460 U.S. 766, 772 (1983).  It is important to note that NEPA "merely prohibits uninformed-rather than unwise-agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989); accord N.J. Dept. of Envtl. Protection v. U.S. Nuclear Regulatory Comm'n 561 F.3d 132, 134 (3d Cir. 2009).

NEPA mandates that federal agencies prepare an EIS for "major federal actions significantly affecting the quality of the human environment."[9]  42 U.S.C. § 4332(2)(C); see Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n, 869 F.2d 719, 725 (3d Cir. 1989).  The NRC may prepare a more limited EA, in lieu of an EIS, if the agency's proposed action would not clearly require production of an EIS.  Dep't of Transp. v. Public Citizen, 541 U.S. 752, 757 (2004).  If an agency determines, pursuant to the EA, that an EIS is not required then

---

[9] Section 4332(2)(C) requires that federal agencies:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-
> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

it must issue a FONSI, which "briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." Id. at 757-58.

The Commission followed this procedure. See Robertson, 490 U.S. at 349-50 ("NEPA itself does not mandate particular results," rather it "imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions."). After conducting a safety evaluation, it issued an EA and FONSI concluding that there was no major federal action that would significantly affect the environment. (JA 491-94.) "An agency decision, based on an EA, that no EIS is required can be overturned only if it is arbitrary, capricious, or an abuse of discretion." Kelley, 42 F.3d at 1518. Courts are not to "substitute [their] judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." Id. However, courts should "determine whether the agency has, in fact, adequately studied the issue and taken a 'hard look' at the environmental consequences of its decision." Id. at 1519.

The Commission's finding was reasonable. The EA and FONSI discuss the revision of the existing exemption and refer to the more detailed safety evaluation (JA 474-490) issued along with the approval of the exemption. The EA concludes that "the

proposed action will not significantly increase the probability
of consequences of accidents." (JA 492.)  It discusses various
environmental impacts and finds that the revision to the
existing exemptions from 1987 will have no additional
environmental impact.  Additionally, the EA found that if the
Commission, in the alternative, denied the exemption application
it would have a similar lack of impact on the environmental
analysis.  (JA 493.)  In plain words, if the Commission ordered
that the facility comply with the one-hour requirement it would
reach the same result in the EA.  The NRC argues that Plaintiffs
ignore "the nature of the regulatory action"; revisions to long
standing exemptions for two discrete areas of the plant, which
have been analyzed comprehensively for fire risks.  (Defs.' Mem.
Opp. 13.)  The Commission's decision not to issue a more strict
EIS was reasonable and far from an abuse of discretion.[10]  This
is exactly the type of circumstance where courts should defer to
the NRC's expertise in conducting substantive safety
evaluations.

---

[10]   To the extent Plaintiffs argue that the Commission, in
drafting the EA, should have considered the possibility of a
terrorist attack, this should be rejected.  The Third Circuit
recently held, in a case involving renewal of a license, that
the NRC did not need to consider independently a terrorist
attack because the effect on the environment would be no worse
than that of a severe accident at the plant.  See N.J. Dep't of
Env. Protection v. U.S. Nuclear Regulatory Comm'n, 561 F.3d at
136-44.

E. Substantive Challenges to the Commission's Decision

Finally, Plaintiffs challenge the merits of the NRC's decision.  Plaintiffs raise several arguments including, inter alia, that the Commission did not consider relevant and probative evidence, that the administrative record lacked specific documents relied upon by the NRC, and that the exemption must be invalid because the Commission's review was conducted too quickly.  Plaintiffs' arguments are without merit.  The record demonstrates that the NRC's decision was neither arbitrary nor capricious.

The APA allows courts to set aside agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).  See F.C.C. v. Fox Television Stations, Inc., 129 S.Ct. 1800, 1810 (2009); Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 545-549 (1978).  This is a very narrow standard of review that gives substantial deference to the agency action.  See Fox Television Stations, 129 S.Ct. at 1810.  The agency must "examine the relevant data and articulate a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983).  The Supreme Court has made clear that "a court is not to substitute its judgment for that of the agency" and that a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

31

Fox Television Stations, 129 S.Ct. at 1810 (quoting Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286 (1974).

### 1. The Commission's Decision was Neither Arbitrary Nor Capricious

The Commission performed a comprehensive safety evaluation in concluding that Entergy "continues to meet the underlying purpose of 10 C.F.R. Part 50, Appendix R, Subsection II.G.2." (JA 502.)  The Commission described the purpose of Appendix R as a "defense-in-depth"[11] approach intended "to prevent, control, and promptly extinguish fires, and to protect structures, systems, and components necessary for a safe shutdown of the plant."  (Id.)  In its analysis, the NRC staff determined that "limited ignition sources plus administrative controls and fire detection/suppression features of these areas provided the

---

[11]  Defense-in-depth means:

> An approach to designing and operating nuclear facilities that prevents and mitigates accidents that release radiation or hazardous materials. The key is creating multiple independent and redundant layers of defense to compensate for potential human and mechanical failures so that no single layer, no matter how robust, is exclusively relied upon. Defense-in-depth includes the use of access controls, physical barriers, redundant and diverse key safety functions, and emergency response measures.

U.S.N.R.C. Glossary, http://www.nrc.gov/reading-rm/basic-ref/glossary/defense-in-depth.html.

requisite defense-in-depth for safe shutdown." The NRC Order

approving the exemption concluded:

> The underlying purpose of Subsection III.g.2 of
> 10 CFR Part 50, Appendix R, is to ensure that one
> of the redundant trains necessary to achieve and
> maintain hot shutdown conditions remains free of
> fire damage in the event of a fire.  Based on the
> existing fire barriers, fire detectors, automatic
> and manual fire suppression equipment,
> administrative controls, the fire hazard
> analysis, the Hemyc configuration, and the
> absence of significant combustible loads and
> ignition sources, NRC staff judges that
> application of Subsection II.G.2 of 10 CFR Part
> 50, Appendix R, for those fire areas is not
> necessary to achieve the underlying purpose of
> this regulation.

(Revision to Existing Exemptions, 72 Fed.Reg. 56,798 (Oct. 4,

2007).)   Plaintiffs dispute the Commission's use of a defense-

in-depth approach.  According to Plaintiffs, the Commission

states inaccurately in its papers that Appendix R requires

defense-in-depth measures.  Rather, Plaintiffs assert that

"Appendix R contains specific, ironclad requirements for, among

other things, the amount of time that insulation on the cables

that control reactor shutdown must survive."  (Pls. Mem. Opp.

1.)  However, Plaintiffs ignore the very language of Appendix R.

Under "General Requirements," Appendix R describes the purpose

of the rule as defense-in-depth:

> The fire protection program shall extend the
> concept of defense-in-depth to fire protection in
> fire areas important to safety, with the
> following objectives:

33

> To prevent fires from starting;
>
> To detect rapidly, control, and extinguish promptly those fires that do occur;
>
> To provide protection for structures, systems, and components important to safety so that a fire that is not promptly extinguished by the fire suppression activities will not prevent the safe shutdown of the plant.

10. C.F.R. Pt. 50, App. R, II.A.  Contrary to Plaintiffs' assertion, the purpose of Appendix R is to satisfy the three objectives of "defense-in-depth" listed above.

As to the first defense-in-depth objective, the Commission evaluated the likelihood and severity of fires in the ETN-4 and PAB-2 Fire Areas. (JA 502-03.)  The NRC was satisfied that "administrative controls of hot work and transient combustibles have improved since the previous exemptions." (JA 506.)  Fire Areas ETN-4 and PAB-2 were now labeled "Level 2" combustible control areas, which limited transient combustibles in those areas to "moderate" quantities. (Id.)  Additionally, any transient combustibles that may exceed the allowable limit would not be allowed into the fire zones without a prior evaluation by a Fire Protection Engineer and further compensatory measures. (JA 507.)  The Commission concluded that potential ignition sources in the fire areas had only a "combined fire severity of less than 10 minutes." (JA 507.)  According to the NRC, the cables were asbestos-jacketed, and the "flame retardant

34

characteristics" of this cable ensured that any fire would not reach significant degrees. (Id.) As such, the Commission found that that the first defense-in-depth objective was achieved. (Id.)

Second, based on the fire detection and suppression systems in the two fire zones, the Commission staff "determined that any postulated fire is expected to be promptly detected by the available automatic fire detection systems in Fire Area ETN-4 (Fire Zone 60A) and Fire Area PAB-2 (Fire Zone 1)." (Id.) The Commission discussed the administrative procedures in place and found that the second objective of defense-in-depth was met. Finally, the Commission determined that based on the limited ignition sources, the administrative controls in place, and the fire detection and suppression features granting the exemption "would not impact IP3 post-fire safe-shutdown capability" as required under objective three. (JA 508.)

Further, the Commission evaluated the fire-resistant capacity of the Hemyc fire wrap at IP3. The NRC concluded: "that the licensee has adequately demonstrated a 30-minute rated fire wrap for the [Fire Area PAB-2 configurations]. The [configuration in Fire Area ETN-4] has been adequately demonstrated to provide a 24-minute rated fire wrap." (JA 504-05.) According to the NRC, the two critical considerations were the existing separation from other fire areas by 3-hour rated fire barriers and

35

automatic and manual fire detection features in the two fire areas.  (JA 505.)

As many courts have emphasized, it is not the role of the courts to substitute their judgment for the substantive decisions of the Commission.  See, e.g., Duke Power Co., 770 F.2d at 390; N. Anna Envtl. Coal., 533 F.2d at 659.  After reviewing the administrative record, it is apparent that the Commission conducted a detailed evaluation, considered the factors listed in the specific regulations and in the end acted reasonably.  See Brodsky, 578 F.3d at 182 ("Ultimately the agency's judgment, if reasonable, must prevail.")

Plaintiffs' remaining arguments are also without merit. Plaintiffs contend that the Commission mischaracterized the record, either by excluding probative documents or by including documents improperly.  Other circuits have held that the Commission, in conducting a performance-based safety review, should not be limited to facts in the record.  See Eddleman, 825 F.2d at 48-49 (holding "that the Commission was not in error in examining facts outside the formal record"); see also Mass. v. U.S. Nuclear Regulatory Comm'n, 878 F.2d at 1524 ("The Commonwealth's argument that the NRC has 'mischaracterized' and 'distorted' the record is, in reality, a complaint that the NRC did not give greater weight to evidence provided by state and local officials and drew conclusions from the evidence that were

36

different than the one's the Commonwealth would have wished.
This, however, does not make the NRC's action arbitrary or
capricious, and it is not for us to reassess the evidence.")
Likewise, Plaintiffs here merely disagree with the Commission's
decision to place emphasis on certain parts of the analysis
rather than on others.  The Court will not reassess the
substance of the evidence.  This is exactly the type of
substantive review that courts should accord deference to if, as
here, it is reasonable.

        Moreover, Plaintiffs do not identify which specific
documents were not considered (or, alternatively, relied upon
unlawfully) that would invalidate the Commission's decision.
The NRC's final order addressed comprehensively the different
factors under 10 C.F.R. 50.12 for granting an exemption.  At
oral argument, Plaintiffs argued that the exemption order made
reference to a "Fire Hazards Analysis" study conducted by
Entergy, which was not in the record and therefore as a matter
of law, the court should find that the Commission's decision was
contrary to law.  The Court disagrees.

        In the exemption order, the Commission wrote that "[b]ased
upon consideration of the information in the licensee's Fire
Hazards Analysis; administrative controls for transient
combustibles and ignition sources; previously-granted exemptions
for this fire zone; and the considerations noted above, the NRC

37

staff concludes that this exemption meets the underlying purpose

of the rule." (JA 510.)   The Commission argued that while there

is no document titled Fire Hazards analysis in the record, the

information and documents comprising the analysis are in the

record.   The Court limits its review to the documents in the

administrative record.[12]   See Lorion, 470 U.S. at 743-44 ("The

task of the reviewing court is to apply the appropriate APA

standard of review, 5 U.S.C. § 706, to the agency decision based

on the record the agency presents to the reviewing court."

(citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402

(1971), abrogated on other grounds by, Califano v. Sanders, 430

U.S. 99 (1977))).   After reviewing the record, and in accordance

with the substantial deference due to an agency under the APA,

it is clear that the Commission's action was neither arbitrary

---

[12]   The 914-page record, comprised of twenty-eight documents from
the NRC, includes several studies and memoranda concerning
Entergy's and the Commission's review and analysis.   The record
contains the exemption applications and analysis from 1984 and
1987 as well. (JA 62, 114, 127.) The July 24, 2006, Entergy
submission requesting a revision of existing exemptions (JA
234), includes as Attachment 1 (JA 237) the conclusions of the
Entergy engineering evaluation.  Also included, among other
documents, are the internal memorandum from the NRC examining
the test results for industry-sponsored Hemyc cable (JA 252);
memorandum from the chief of the NRC Division of Operating
Reactor Licensing requesting supplemental information from
Entergy in order to evaluate their request (JA 275); a request
to Entergy for additional information (JA 278); a supplemental
response answering the Commission's additional information
requests (JA 444, 451); internal memorandum from the NRC Fire
Protection Branch enclosing its safety evaluation report (JA
472); the EA and FONSI issued by the NRC (JA 487); and the
September 28, 2007 Exemption (JA 495).

nor capricious.  The Court will not substitute its own judgment
for that of the Commission and will not demand "ideal clarity"
where the "the agency's path may reasonably be discerned." See
Fox Television Stations, 129 S.Ct. at 1810.

Plaintiffs' final argument is that the Commission granted
Entergy's exemption too quickly.  There is no foundation to this
claim, in fact or law.  There is nothing suspicious about the
amount of time it took the Commission to review the request (the
initial request was on July 24, 2006 (JA 234) and the exemption
was granted on September 28, 2007—approximately fourteen months
later).  Also significantly, these were revisions to earlier
granted exemptions on an issue that the Commission had reviewed
previously.

The APA requires a court to set aside agency action if it
appears in the record that such action is "arbitrary,
capricious, an abuse of discretion, or otherwise not in
accordance with law."  Here, there is nothing in the record that
demonstrates such.  The Commission based its decision "on a
consideration of the relevant factors."  Citizens to Preserve
Overton Park v. Volpe, 401 U.S. 402, 416 (1971); see Duke Power,
770 F.2d at 389-90.  Entergy's application requested revisions
to exemptions granted more than twenty years ago.  The
Commission engaged in a substantive analysis of the IP3's safety
measures before granting the revised exemptions.

This is a case where deference to the substantive decision of the Commission, as it relates to nuclear safety, is warranted.

III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [dkt. no. 5] is granted in its entirety. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

Dated:     March 4, 2011
           New York, New York

LORETTA A. PRESKA
CHIEF United States District Judge

41